**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2582
_____

ALFREDO SEMPER,
                              Appellant

v.

CURTIS V. GOMEZ;
UNITED STATES OF AMERICA
_____

On Appeal from the
District Court of the Virgin Islands
(D.C. Civil No. 1-12-cv-00079)
District Judge: Hon. Harvey Bartle, III
_____

Argued December 10, 2013

BEFORE: FISHER, COWEN AND NYGAARD,
Circuit Judges

(Filed: March 24, 2014)

Andrew C. Simpson, Esq. (Argued)
Andrew C. Simpson Law Offices
2191 Church Street, Suite 5
Christiansted, VI 00820

       Counsel for Appellant

Marleigh D. Dover, Esq.
United States Department of Justice
Civil Division, Room 7210
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Stephanie R. Marcus, Esq. (Argued)
United States Department of Justice
Civil Division, Room 7642
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

       Counsel for Appellees

––––––––––––––––

OPINION

––––––––––––––––


COWEN, <u>Circuit Judge</u>.

Plaintiff Alfredo Semper appeals from the order of the District Court of the Virgin Islands granting the motion to dismiss filed by Defendants Curtis V. Gomez and the United

States of America. We will affirm the District Court's order insofar as it dismissed Semper's official capacity claim against Chief Judge Gomez, his claim against the United States, and his claim for a writ of mandamus for lack of subject matter jurisdiction. Furthermore, we will remand this matter to the District Court with instructions to dismiss his individual capacity claim against Chief Judge Gomez for lack of subject matter jurisdiction.

## I.

On July 3, 2010, Luis Roldan, a pretrial releasee under the supervision of the Probation Office of the District Court of the Virgin Islands, was found murdered. At the time, Semper was employed by the District Court as a probation officer, a position he had held since 2001. His employment was terminated on August 8, 2010, purportedly on the grounds that he was the probation officer assigned to supervise the releasee and "was 'extremely negligent in the supervision of Mr. Roldan.'" (A26.) According to Semper, he was not given a hearing before his termination and, "[o]ther than the conclusory statements set forth above, plaintiff was not informed of any facts that supported his termination." (Id.) Semper claimed that, had he been given a hearing, he would have shown that he was not negligent in his duties because he was not the probation officer assigned to supervise Roldan. Then-Chief Judge Curtis V. Gomez allegedly made the final decision to terminate Semper's employment.

3

Semper filed an action pursuant to the Tucker Act against the United States in the Court of Federal Claims. Seeking reinstatement and back pay, he alleged that he was terminated without cause and without a pre-termination hearing in violation of the Due Process Clause of the Fifth Amendment and 18 U.S.C. § 3602. Section 3602(a) provides that "[a] district court of the United States shall appoint qualified persons to serve, with or without compensation, as probation officers within the jurisdiction and under the direction of the court making the appointment." In turn, "[t]he court may, for cause, remove a probation officer appointed to serve with compensation, and may, in its discretion remove a probation officer appointed to serve without compensation." 18 U.S.C. § 3602(a).

The government moved to dismiss Semper's action on jurisdictional grounds. According to the government, Semper was classified as a member of the so-called excepted service under the Civil Service Reform Act of 1978 ("CSRA"), and, in turn, he was not among those excepted service employees eligible under this statutory scheme for judicial or administrative review of adverse agency actions. "Because the CSRA governs the procedural rights of members of both the competitive service and the excepted service, the government argued that Congress's decision to deny any right to administrative or judicial review to persons such as Mr. Semper for actions such as termination foreclosed him from obtaining review of his termination in other forums, such as the Court of Federal Claims." Semper v. United States, 694 F.3d 90, 91 (Fed. Cir. 2012).

4

Although it granted the government's motion to dismiss for lack of subject matter jurisdiction, the Court of Federal Claims actually disagreed with the government's CSRA theory. Semper v. United States, 100 Fed. Cl. 621, 622-38 (Ct. Fed. Cl. 2011). As the Federal Circuit subsequently explained, the Court of Federal Claims "found that because Mr. Semper was employed in the Judicial Branch, the CSRA did not apply to him and therefore did not have the effect of foreclosing his access to judicial or administrative remedies." Semper, 694 F.3d at 92. The Court of Federal Claims nevertheless concluded that it lacked jurisdiction over Semper's action because he failed to set forth a money-mandating statute or regulation—or a "network" of such statutes and regulations—giving him the right to contest his termination in a Tucker Act proceeding. Semper, 100 Fed. Cl. at 633-38. In reaching this conclusion, it noted that the District Court of the Virgin Islands had not adopted the "Model Adverse Action Procedure for Removal of a Probation Officer" developed by the Judicial Conference of the United States. Id. at 637. Nevertheless, the District Court did adopt the "Equal Employment Opportunity and Employment Dispute Resolution Plan" (or the "Consolidated Model Plan"). Id. This remedial plan was proposed by the Third Circuit Judicial Council (and, in turn, was based on the Model Equal Employment Opportunity Plan prepared by the Judicial Conference in 1980 as well as the Judicial Conference's 1997 Model Employment Dispute Resolution Plan). According to the Court of Federal Claims, the Consolidated Model Plan does not apply to Semper's case because it only covers "equal employment opportunity and anti-discrimination rights." Id. (citing Consolidated Model

5

Plan).  Nevertheless, the Court of Federal Claims stated that the failure of the District Court to adopt the applicable model procedures does not furnish Semper a cause of action in either the Court of Federal Claims or in any other federal court.  Id. at 638.  "In sum, none of the three statutes, the constitutional provision, or plaintiff's network theory on which plaintiff attempts to rely, provide jurisdiction for this court to review plaintiff's claims."  Id.

Semper appealed, but the Federal Circuit affirmed the dismissal of his action based "on the reasoning originally advanced by the government below:  that because Mr. Semper is a member of the excepted service, the CSRA forecloses his right to seek review of his termination in the Court of Federal Claims."  Semper, 694 F.3d at 92.  Relying in particular on the Supreme Court's ruling in United States v. Fausto, 484 U.S. 439 (1988), the Federal Circuit determined that "the CSRA 'was meant to preclude judicial review' of adverse agency actions by employees in Mr. Semper's position, rather than 'merely to leave them free to pursue the remedies that had been available before enactment of the CSRA,'" Semper, 694 F.3d at 96 (quoting Fausto, 484 U.S. at 443-44).  Accordingly, the Federal Circuit expressly rejected Semper's theory that the CSRA and the holding of Fausto do not extend to employees of the Judicial Branch.  Id. at 94-96.  Citing to our own opinion in Mitchum v. Hurt, 73 F.3d 30 (3d Cir. 1995), together with a number of other rulings, the Federal Circuit went on to explain that it expressed no opinion as to whether Semper could pursue a due process claim in a district court action:

6

At oral argument, the question was raised whether Mr. Semper could litigate his due process claim in a district court action, either in an action for damages under the Bivens doctrine (see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, [403 U.S. 388 (1971)]), or by seeking reinstatement, or both.  We do not address that issue other than to note that it has been presented to a number of circuits, which have expressed varying views on the issue.  See Dotson v. Griesa, 398 F.3d 156, 180 (2d Cir. 2005); [Mitchum, 73 F.3d at 36]; Saul v. United States, 928 F.2d 829, 842-43 (9th Cir. 1991); Lombardi v. Small Bus. Admin., 889 F.2d 959, 961-62 (10th Cir. 1989); Hubbard v. EPA, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) see generally Elgin v. Dep't of the Treasury, [132 S. Ct. 2126 (2012)]); Schweiker v. Chilicky, [487 U.S. 412 (1988)]; Bush v. Lucas, [462 U.S. 367 (1983)].  Mr. Semper has informed us that if he is not successful in obtaining review of his dismissal by the Court of Federal Claims, he will pursue his due process claim in a district court action.

Semper, 694 F.3d at 96.

Semper filed a petition for a writ of certiorari, which was denied.  See Semper v. United States, 133 S. Ct. 1583 (2013).

7

Semper filed the current action in the District Court, claiming that the District Court possessed federal question jurisdiction pursuant to 28 U.S.C. § 1331.  Alleging that he was denied a pre-termination hearing and terminated without cause in violation of the Due Process Clause and § 3602, Semper set forth the following four counts in his amended complaint:  (1) a Bivens claim against Chief Judge Gomez in his individual capacity; (2) a claim against Chief Judge Gomez in his official capacity; (3) a claim against the United States pursuant to the waiver of sovereign immunity contained in the Administrative Procedure Act ("APA"); and (4) a claim under the Mandamus Act, 28 U.S.C. § 1361, against Chief Judge Gomez.  He specifically requested injunctive relief in the form of an order directing Chief Judge Gomez to reinstate him to his position as a probation officer and to correct his personnel file to reflect that he was discharged without cause as well as back pay.  He also sought a declaration to the effect that his termination was without cause and violated § 3602 together with an award of reasonable attorneys fees.  Chief Judge Gomez and the government moved to dismiss Count One for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and Counts Two, Three, and Four for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

The District Court granted Appellees' motion to dismiss.  See Semper v. Gomez, Civil Action No. 12-79, 2013 WL 2451711 (D.V.I. June 4, 2013).  As to Count One, the District Court concluded that, even if a former judicial employee's Bivens action for equitable relief could be

8

considered viable in certain circumstances, a chief judge acting in his or her individual capacity lacks the authority to reinstate a probation officer because such a step constitutes an official governmental act. It applied the same line of reasoning to his request for declaratory relief, i.e., "[t]here is no basis for declaratory relief against a person when it would be meaningless." Id. According to the District Court, it also lacked subject matter jurisdiction to issue a writ of mandamus under the Mandamus Act because that statute only applies to officials in the Executive Branch.

The District Court agreed with Appellees that Counts Two and Three must be dismissed for lack of subject matter jurisdiction. While "[t]he [APA], 5 U.S.C. § 702, waives the immunity of certain government agencies and federal officials where a party seeks relief other than money damages," § 701 "excludes 'the courts of the United States' from the definition of an 'agency.'" Id. at *3-*4. According to the District Court, it was not required to decide whether the District Court of the Virgin islands constitutes a court of the United States for purposes of this APA exclusion because, "[i]f it is not, it then clearly fits under another exclusion from the definition of an agency—specifically the exclusion of 'the governments of the territories or possessions of the United States' of which it is a part." Id. at *4. Having found that the APA's limited waiver of sovereign immunity did not apply to either the District Court of the Virgin Islands or its Chief Judge sued in his official capacity for injunctive or declaratory relief, "[t]he question remains as to whether the Chief Judge may be sued in his official capacity for injunctive or declaratory relief, notwithstanding the language of the APA." Id. Answering

9

this question in the negative, the District Court distinguished our ruling in <u>Mitchum</u>, which purportedly allowed several current and former employees of the Veterans Administration Medical Center ("VAMC") to pursue First Amendment claims for injunctive and declaratory relief against the administrator of the VAMC. According to the District Court, <u>Mitchum</u> did not involve a Judicial Branch employee, did not cite any cases involving such an employee or a request for injunctive relief against a judge or some other official of the Judicial Branch, and did not discuss the APA's distinction between executive agencies and the courts of the United States (as well as governments of the territories). "As <u>Mitchum</u> acknowledged, 'Congress may restrict the availability of injunctive relief,'" <u>id.</u> at *5 (quoting <u>Mitchum</u>, 73 F.3d at 35), and, according to the District Court, it did so in this case: "The comprehensive scheme under the CSRA, coupled with the exclusion of 'other than money relief' against the District Court of the Virgin Islands under § 701 of the APA precludes in our view the equitable and declaratory relief plaintiff seeks here as a former judicial branch employee." <u>Id.</u>

The District Court also observed that "[t]he lack of remedy for plaintiff, a former judicial branch employee under <u>Bivens</u> or under any statute must be understood in context." <u>Id.</u> at *6. It explained that:

> The judiciary has developed its own mechanisms to deal with employment issues in the absence of these other remedies. Since 1996 it has been the policy of the federal

10

judiciary through the Judicial Conference of the United States "to follow the equal employment opportunity principles applicable to the private sector and government employers." Dotson, 398 F.3d at 172. The Virgin Islands has in place a "Consolidated Equal Employment Opportunity and Employment Dispute Resolution Plan." The Plan is based on the Model Equal Employment Opportunity Plan adopted by the Judicial Conference of the United States in March 1980 and also includes elements of the Model Employment Dispute Resolution Plan adopted in March 2010. The Plan provides procedures for dealing with "workplace and employment issues" including not only those involving discrimination but also "personnel practices." Probation officers, among other judicial employees, are protected. Violations by judges as well as other court employees are covered. If there is an allegation against a judge, the duties under the Plan shall be performed by the Third Circuit Judicial Council. The Plan provides the employee with due process rights and allows the right to counsel. There is a prohibition against retaliation. Although payment of attorneys' fees (except as authorized under the Back Pay Act), compensatory damages, and punitive damages are not available, an employee is entitled to back pay under certain circumstances and to various forms of equitable relief

11

including "reinstatement to a position from which previously removed." The decision of the Judicial Council will be final.

The record does not reveal whether plaintiff has made any attempt to seek relief under this court's Plan.

Id. (footnote omitted). In a footnote, the District Court pointed out that "[t]he probation officer in Dotson sued not only for race discrimination, but as the plaintiff here, for violation of due process."[1] Id. at *6 n.6.

## II.

Alleging that his due process rights were violated, Semper filed a federal question action under 28 U.S.C. § 1331 seeking equitable and declaratory relief against Chief Judge

---

[1] Before the parties commenced briefing Semper's appeal from the District Court's ruling, Judge Wilma A. Lewis was appointed the Chief Judge of the District Court of the Virgin Islands.

Gomez and the United States.[2]  Nevertheless, we conclude that the CSRA precludes Semper's constitutional claims for equitable and declaratory relief because he was a judicial employee who could pursue meaningful relief under a remedial plan adopted by the District Court of the Virgin Islands that provides for meaningful review of his claims by judicial officers.  Accordingly, the District Court lacked subject matter jurisdiction over his claims.  In addition, the District Court did not commit reversible error by dismissing Semper's mandamus claim on jurisdictional grounds.

## A.    Semper's Constitutional Claims for Equitable and Declaratory Relief

### 1.    The CSRA and Subject Matter Jurisdiction

"The portion of the CSRA that is codified in Chapter 75 of Title 5 of the United States Code details the procedural protections afforded to government employees who are subjected to certain adverse personnel actions." Semper, 694

---

[2]    Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The District Court of the Virgin Islands, in turn, possesses "the jurisdiction of a District Court of the United States."  48 U.S.C. § 1612(a).  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.  Questions of subject matter jurisdiction raised on a motion to dismiss under Rule 12(b)(1) are reviewed under a de novo standard.  See, e.g., Baer v. United States, 722 F.3d 168, 172 (3d Cir. 2013).

F.3d at 92 (citing 5 U.S.C. §§ 7501-7543). As the Federal Circuit observed, this statutory scheme provides for administrative review by the Merit Systems Protection Board ("MSPB"), followed by judicial review by the Federal Circuit itself. Id. The CSRA further "provides that those procedures are available only to 'employees,' a term that excludes members of the excepted service who do not satisfy particular eligibility or tenure requirements, and it further excludes certain categories of 'employees' from entitlement to the review procedures." Id. (citing 5 U.S.C. §§ 7511(a)(1), 7511(b)). "Mr. Semper was in the excepted service, not the competitive service," was not preference eligible, was not serving a probationary or trial period pending conversion to the competitive service, and, although he had competed two years of continuous service, "his service was in the Judicial Branch and not in a position in an Executive Branch agency." Id. at 92-93. Accordingly, "Mr. Semper does not fall within the statutory definition of an 'employee' and therefore is not entitled to the administrative and judicial review procedures prescribed by the CSRA." Id. at 93.

Semper sought to bypass the CSRA by bringing suit in the Court of Federal Claims under the Tucker Act. In United States v. Fausto, 484 U.S. 439 (1988), a non-preference eligible excepted service member in the Executive Branch employed a similar strategy, filing suit in the Claims Court because he was precluded from seeking administrative review under the CSRA. Fausto, an excepted service employee of the Fish and Wildlife Service (who, at that time, did not have a right to administrative or judicial review under the CSRA), filed a Claims Court action under the Back Pay and Tucker

14

Acts challenging his 30-day suspension for unauthorized use of a government vehicle. Fausto, 484 U.S. at 440-43. According to the Supreme Court, "[t]he comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review for the type of personnel action covered by that chapter." Id. at 448. As the Supreme Court subsequently explained in Elgin v. Department of the Treasury, 132 S. Ct. 2126 (2012), the Fausto Court "found it 'fairly discernible' that Congress intended to preclude all judicial review of Fausto's statutory claims," id. at 2133 (footnote omitted) (quoting Fausto, 484 U.S. at 452). "Just as the CSRA's 'elaborate' framework, [Fausto, 484 U.S. at 443], demonstrates Congress's intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA *grants* administrative and judicial review." Id. Applying Fausto to the Judicial Branch, the Federal Circuit determined that "Congress's decision not to afford persons in Mr. Semper's position any right of administrative or judicial review under the CSRA forecloses him from obtaining judicial review of his termination by an alternative mechanism, i.e., through an action in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491." Semper, 694 F.3d at 93.

15

Even before its decision in Fausto, the Supreme Court refused to allow a NASA employee who had allegedly been suspended for whistle-blowing (and who had a right to review under pre-CSRA law and actually had obtained reinstatement with back pay through this process) to pursue a Bivens action for damages against his supervisor for retaliation in violation of the First Amendment. Bush, 462 U.S. at 368-90. In Bush v. Lucas, 462 U.S. 367 (1983), the Court observed that a proposed Bivens action could be defeated where there are "'special factors counseling hesitation in the absence of affirmative action by Congress,'" id. at 377 (quoting Carlson v. Green, 446 U.S. 14, 18-19 (1980)). "Because [Bush's] claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, we conclude that it would be inappropriate for us to supplement the regulatory scheme with a new judicial remedy." Id. at 368. The Bush Court reached this conclusion even though the civil service remedies were not as effective as a judicial award of damages would be and did not fully compensate the employee for the harm he suffered, e.g., his attorney's fees were not paid by the government. See, e.g., id. at 372 & n.9; see also, e.g., Schweiker, 487 U.S. at 414-29 (refusing to recognize non-statutory damages claim for unconstitutional denial Social Security disability benefits).

At this time, it is undisputed that the CSRA precludes current or former federal employees from bringing a Bivens damages action for alleged constitutional violations arising out of the employment context. In fact, the Second, Ninth and Eleventh Circuits have concluded that current or former

16

employees of the Judicial Branch—who otherwise have no right to administrative or judicial review under the CSRA itself—could not bring damages claims pursuant to the Bivens doctrine. Dotson, 398 F.3d at 159-83; Blankenship v. McDonald, 176 F.3d 1192, 1194-96 (9th Cir. 1999); Lee v. Hughes, 145 F.3d 1272, 1273-77 (11th Cir. 1998). As we explained in Sarullo v. USPS, 352 F.3d 789, 795 (3d Cir. 2003) (per curiam), "[w]e held [in Mitchum] that the CSRA affords the exclusive remedy for damage claims of federal employees seeking redress for alleged constitutional violations arising out of the employment relationship," id. at 795. We then determined in Sarullo that "the District Court lacked subject matter jurisdiction to hear Sarullo's Bivens claim [of malicious prosecution following an investigation into whether he was selling drugs to other postal employees inside the post office] as such a claim was barred by the comprehensive statutory scheme provided in the CSRA, and should have dismissed the Bivens claim for lack of subject matter jurisdiction." Id. at 797.

### 2. **Mitchum and Elgin**

Based on these legal principles, this Court now must decide the question that the Federal Circuit itself refused to resolve, i.e., whether or not Semper "could litigate a due process claim" for equitable and declaratory relief "in a district court action" filed pursuant to § 1331. Semper, 694 F.3d at 96. In addressing this rather complex question, we begin with our opinion in Mitchum.

17

In <u>Mitchum</u>, three current or former employees of the Pittsburgh VAMC filed a § 1331 action "against VAMC administrators [for equitable and declaratory relief], claiming among other things, that the administrators had violated the employees' First Amendment rights by retaliating against them for making statements intended to secure improvements for VAMC patients." <u>Mitchum</u>, 73 F.3d at 31. The district court granted summary judgment in favor of the defendants on the basis that "the plaintiffs could not assert such claims in federal court but were instead required to pursue available administrative remedies." <u>Id.</u> "Because <u>Bush</u> and the other Supreme Court decisions on which the defendants rely concern the recognition of non-statutory damages remedies rather than injunctive and declaratory relief," this Court (in an opinion by then-Judge Alito) reversed. <u>Id.</u>

We noted that "all three appellants could have pursued administrative remedies to vindicate the alleged violations of their First Amendment rights."[3] <u>Id.</u> Based on our discussion

---

[3] Specifically, one plaintiff (Krumholz, the Staff Assistant to the Associate Director) enjoyed the protections of the CSRA itself, which allowed him to file an allegation of a prohibited personnel practice with the MSPB's Office of Special Counsel ("OSC") and to obtain review by the MSPB. <u>Id.</u> at 31-32. "A final order or decision is subject to judicial review in the United States Court of Appeals for the Federal Circuit." <u>Id.</u> at 32 (citing 5 U.S.C. §§ 1221(h), 7703(b)). Krumholz initially filed an administrative complaint under this CSRA process, but it was dismissed because he had already commenced his action in the district court. <u>Id.</u> at 32

18

of <u>Fausto</u>, <u>Schweiker</u>, and especially <u>Bush</u>, we admitted that "a good argument can be made that a federal employee who has meaningful administrative remedies and a right to judicial review under the CSRA or another comparable statutory scheme should not be permitted to bypass that scheme by bringing an action under 28 U.S.C. § 1331 and seeking injunctive or declaratory relief." <u>Id.</u> at 34. "Several courts of appeals have so held, and these have much to recommend them. <u>See, e.g</u>, [<u>Saul</u>, 928 F.2d at 843]; <u>Stephens v. Dep't of Health and Human Services</u>, 901 F.2d 1571, 1575-77 (11th Cir. 1990); [<u>Lombardi</u>, 889 F.2d at 926]." <u>Mitchum</u>, 73 F.3d

n.2. The other two plaintiffs (Mitchum, the former Chief of Medical Services, and Webb, Assistant Chief Nurse for Special Projects) were subject to a different statutory scheme (and neither the parties nor this Court expressed any opinion as to whether their grievances could have been presented to an appeals board and then to the Federal Circuit under this scheme or whether their claims had to be pursued through internal administrative channels or pursuant to a collective bargaining agreement). <u>Id.</u> at 32 & n.3. The <u>Mitchum</u> plaintiffs sought various kinds of injunctive and declaratory relief from the district court, "including an order directing the defendants to cease and desist from retaliation, harassment, and reprisal; an order directing the removal of certain documents from the plaintiffs' files; and an order directing the appointment of a permanent community-based board of overseers to monitor the operations of the facility." <u>Id.</u> at 33. "Webb and Krumholz also sought reinstatement to their prior positions." <u>Id.</u>

at 34 (footnote omitted). In two other instances, the respective circuit courts either reserved judgment or found that a party could not obtain injunctive relief for minor personnel actions. Id. at 34 n.5 (citing Bryant v. Cheney, 924 F.2d 525, 528 (4th Cir. 1991); Pinar v. Dole, 747 F.2d 899 (4th Cir. 1984)).

However, the D.C. Circuit reached the opposite conclusion in a case filed by an unsuccessful job applicant who claimed he had been rejected due to his First Amendment activities. Id. at 34. The original panel in Hubbard v. EPA, 809 F.2d 1 (D.C Cir. 1986), "held that Bush defeated the applicant's Bivens claim for damages but permitted him to seek the equitable remedy of reinstatement.'" Mitchum, 73 F.3d at 35 (quoting Hubbard, 809 F.2d at 11). The full D.C. Circuit reaffirmed the panel's decision on the damages claim and (while it did not rehear the reinstatement claim) indicated that equitable relief was appropriate. Id. (discussing Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988) (en banc) (per curiam)).

Although with some reluctance, we followed the D.C. Circuit's approach:

> On balance, we think that the District of Columbia Circuit has taken the better course. The power of the federal courts to grant equitable relief for constitutional violations has long been established. See, e.g., Osborn v. United States Bank, 9 Wheat. 738, 838-46, 859, 6 L. Ed. 204 (1824); Ex parte Young, [209 U.S.

20

123, 156 (1908)]. Thus, as the District of Columbia Circuit observed, there is a "'presumed availability of federal equitable relief against threatened invasions of constitutional interests.'" Hubbard, 809 F.2d at 11 (quoting [Bivens, 403 U.S. at 404] (Harlan, J., concurring in the judgment)). It is reasonable to assume that Congress legislates with the understanding that this form of judicial relief is generally available to protect constitutional rights. While Congress may restrict the availability of injunctive relief (see, e.g., 28 U.S.C. §§ 1341, 2283; 26 U.S.C. § 7421(a)), we believe that we should be very hesitant before concluding that Congress has impliedly imposed such a restriction on the authority to award injunctive relief to vindicate constitutional rights.

Id. We acknowledged that the Bush Court found that the history and structure of the CSRA was sufficiently clear to preclude the creation of a new Bivens claim. Id. "But the Supreme Court has developed a special jurisprudence for Bivens claims, and we are hesitant to extend this jurisprudence into other spheres." Id. In other words, "it does not necessarily follow that the long-recognized availability of injunctive relief should be restricted" merely "because 'special factors counseling hesitation' militate against the creation of a new non-statutory damages remedy." Id. While "[w]e assume that the power of the federal courts to award legal and equitable relief in actions under 28 U.S.C.

21

§ 1331 stems from the same source, see Bush, [462 U.S. at 374]," this "does not mean that the factors that counsel against one type of relief are equally applicable with respect to the other." Mitchum, 73 F.2d at 35-36 (citing Bivens, 403 U.S. at 405-06 (Harlan, J., concurring in the judgment); Dellinger, Of Rights and Remedies: The Constitution as A Sword, 85 Harv. L. Rev. 1532, 1543 (1972)).

Accordingly, we recognized the Supreme Court's reluctance to create non-statutory damages remedies for federal employees subject to adverse employment actions, a reluctance manifested in Bush, Fausto, and Schweiker. But we observed an important distinction: whereas Bivens claims were a "'recent judicial creation'" easily preempted by Congress, "[t]he power of the federal courts to grant equitable relief for constitutional violations" had much deeper roots. Id. at 35 (quoting Hubbard, 809 F.2d at 11 n.15). Because of the """"presumed availability"""" of equitable relief—a presumption of which we assumed Congress to be aware—we declined to interpret the CSRA to impliedly curtail our authority to grant such relief. Id. (quoting Hubbard, 809 F.2d at 11). To hold otherwise would be "a big and important jump" that we were hesitant to make "[w]ithout more specific guidance from the Supreme Court." Id. at 36. Although not directly on point because it involved executive rather than judicial employees, Mitchum stands for the broader proposition that we should be leery to restrict a federal court's ability to grant equitable relief in order to vindicate a constitutional right.

22

Semper unsurprisingly relies on our Mitchum opinion, and, at least when viewed in isolation, it does seem to weigh in his favor. After all, we allowed the plaintiffs' constitutional claims for equitable and declaratory relief to go forward even though they "could have pursued administrative remedies to vindicate the alleged violations of their First Amendment rights." Id. at 31. We likewise rejected the theory—adopted by several other circuit courts—that "a federal employee who has meaningful administrative remedies and a right to judicial review under the CSRA or another comparable statutory scheme should not be permitted to bypass that scheme by bringing an action under 28 U.S.C. § 1331 and seeking injunctive or declaratory relief." Id. at 34.

Nevertheless, both the District Court and Appellees point out that the Mitchum opinion did not involve an employee of the Judicial Branch. At the very least, it is atypical for a court to hear a § 1331 action filed by one of its own employees asking the court to enter an injunction against its own chief judge requiring him or her to reinstate this former employee because the termination violated the Constitution. In contrast, there is a long-standing tradition of federal courts granting equitable relief against federal executive officials to vindicate the constitutional rights of the plaintiffs. Following the example set by the D.C. Circuit, we discussed this extensive history of the judiciary enjoining unconstitutional executive actions in Mitchum. See, e.g., id. at 35.

23

Likewise, Congress has indicated on a number of occasions that employment disputes within the Judicial Branch implicate a special set of circumstances, including the doctrine of separation of powers and the protection of an independent judiciary. As the Federal Circuit noted, Congress responded to Fausto by amending the CSRA to extend review rights to certain excepted service employees in the Executive Branch—but not the Judicial Branch. Semper, 694 F.3d at 95. It also enacted the Administrative Office of the United States Courts Personnel Act of 1990 so as to close "a loophole in the statutory scheme" that had granted CSRA review rights to certain employees of the Administrative Office. Id. (citation omitted); see also Dotson, 398 F.3d at 171. Congress allowed the Administrative Office to create a personnel system "'free from executive branch controls and more similar to that of the rest of the judicial branch'" because "'Executive Branch oversight of its personnel activities was deemed 'contrary to the doctrine of separation of powers.'" Semper, 694 F.3d at 95 (quoting H.R. Rep. No. 101-770(I) (1990), reprinted in 1990 U.S.C.C.A.N. 1709, 1710). Furthermore, Congress ultimately decided not to include judicial employees under the Congressional Accountability Act of 1995 (which extended the protections of various labor laws to legislative employees and created a process by such employees could obtain relief from Congress's Office of Compliance and then the judiciary) due to concerns about judicial independence. See Dotson, 398 F.3d at 173-75 (footnote omitted). Ordered to make a report to Congress, the Judicial Conference emphasized the importance of an internal governance system to maintaining an independent Judicial Branch. Id. at 175. Evidently

24

satisfied by the judiciary's history of handling personnel complaints through its own administrative review procedures and its proposal to revise the Judicial Conference's model equal employment opportunity plan, Congress took no further action. Id. at 174. Finally, the District Court noted that the APA, although it expressly allows for injured persons to bring non-damage claims with respect to the misconduct of federal agencies and their officers, excludes "the courts of the United States" (as well as the territorial governments) from its definition of an "agency." See 5 U.S.C. §§ 701-702.

Admittedly, these various considerations by themselves may not be sufficient to distinguish Mitchum. After all, courts and judges—like executive agencies and their officials—are bound by the Constitution. In fact, given their critical role in interpreting the Constitution and vindicating constitutional rights, they should be held to the highest standards. In Dotson v. Griesa, 398 F.3d 156 (2d Cir. 2005), the Second Circuit ultimately concluded that a former probation officer—who alleged unconstitutional race discrimination  as well as the denial of due process in connection with his termination—could not pursue a district court action for either damages or for equitable relief, id. at 159-83. But it did so with some reluctance, specifically stating that it was "mindful that it may appear, at first glance, to exempt the judiciary from any judicial review of its own employment actions, even with respect to charges of discrimination." Id. at 160. Nevertheless, there is more to the current appeal than our prior ruling in Mitchum or the various circumstances implicated by judicial employment disputes.

25

In its 2012 decision in Elgin, the Supreme Court addressed whether former federal employees fired because they failed to register with the Selective Service (and who were competitive service employees with the rights under the CSRA to a hearing before the MPSB as well to file a petition for review with the Federal Circuit) could pursue equitable claims challenging the facial unconstitutionality of Selective Service legislation. Elgin, 132 S. Ct. at 2130-40. One of the plaintiffs (Elgin) appealed his removal to the MSPB, but the ALJ dismissed this appeal on the grounds that an employee is not entitled to MSPB review of agency action based on an absolute statutory bar to employment and that the MSPB otherwise lacks the jurisdiction to rule on the constitutionality of a federal statute. Id. at 2131.

According to the plaintiffs, the general grant of federal question jurisdiction under § 1331, which gives district courts jurisdiction over constitutional claims, remains undisturbed unless Congress explicitly states otherwise. Id. at 2132. They specifically "rely on Webster v. Doe, [486 U.S. 592 (1977)], which held that 'where Congress intends to preclude judicial review of constitutional claims [,] its intent to do so must be clear.'" Elgin, 132 S. Ct. at 2132 (quoting Webster, 486 U.S. at 603). This "'heightened showing' was required to 'avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.'" Id. (quoting Webster, 486 U.S. at 603). The Elgin Court explained that, "[a]lthough Fausto interpreted the CSRA to entirely foreclose judicial review, the Court had no need to apply a heightened standard

26

like that applied in [Webster] because Fausto did not press any constitutional claims." Id. at 2133 n.4.

Although constitutional claims were alleged by the Elgin plaintiffs, the Supreme Court refused to apply the heightened Webster standard because "the CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit," which "is fully capable of providing meaningful review of petitioners' claims." Id. at 2132 (citation omitted). The Supreme Court accordingly held that "the CSRA provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional." Id. at 2130; see also, e.g., id. at 2140 ("For the foregoing reasons, we conclude that it is fairly discernible that the CSRA review scheme was intended to preclude district court jurisdiction over petitioner's claims."). It was uncontested that the MSPB routinely adjudicates a variety of constitutional claims (including claims that an adverse agency action violated an employee's First or Fourth Amendment rights), and the Elgin plaintiffs admitted that such claims must be brought under the CSRA process. See, e.g., id. at 2134. In turn, the CSRA scheme allowed for meaningful review of facial constitutional challenges because the plaintiffs "are covered employees challenging a covered employment action," the Federal Circuit has the "authority to consider and decide petitioners' constitutional claims," and, insofar as such challenges may require factual development, "the CSRA equips the MSPB with tools to create the necessary record." Id. at 2139.

27

The Supreme Court's decision in Elgin provides the "more specific guidance" we sought in Mitchum. The Elgin Court held that the "'elaborate' framework" of the CSRA was exclusive, "demonstrat[ing] Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review . . . [as well as] those employees to whom the CSRA *grants* administrative and judicial review." Id. at 2133 (quoting Fausto, 484 U.S. at 443). In light of the CSRA's purpose to create an "'integrated scheme of administrative and judicial review,'" and bring uniformity in decision-making to federal employment disputes, it followed that "the statutory review scheme is exclusive, even for employees who bring constitutional challenges to federal statutes." Id. at 2135 (quoting Fausto, 484 U.S. at 444-45). Thus, in concluding that the CSRA precluded district court jurisdiction over the petitioners' constitutional claims for equitable relief, Elgin effectively overruled Mitchum insofar as that decision had allowed plaintiffs who "could have pursued administrative remedies to vindicate the alleged violations of their First Amendment rights" to seek equitable relief in district court. Mitchum, 73 F.3d at 31; see also id. at 34 (hesitantly rejecting argument adopted by other circuits that "a federal employee who has meaningful administrative remedies and a right to judicial review under the CSRA or another comparable statutory scheme should not be permitted to bypass that scheme by bringing an action under 28 U.S.C. § 1331 and seeking injunctive or declaratory relief").

We now conclude that the CSRA precludes a federal employee from litigating constitutional claims for equitable and declaratory relief in a § 1331 action where the employee

28

could pursue meaningful relief under a remedial plan that provides for meaningful review of his or her claims by judicial officers. However, a federal employee who could not pursue meaningful relief through a remedial plan that includes some measure of meaningful judicial review has the right to seek equitable and declaratory relief for alleged constitutional violations in a "federal question" action filed pursuant to § 1331.

We believe that this approach honors both our ruling in Mitchum as well as the Supreme Court's decisions in Elgin (as well as Fausto, Bush, and Webster). We further observe that our ruling today permits an employee to obtain meaningful redress for violations of his or her own constitutional rights through a process involving meaningful review by judicial officers while—at the same time—taking into account the special set of circumstances arising out of employment disputes between the judiciary and its own employees. As we have already indicated, the Second Circuit determined that the CSRA precluded a former probation officer's constitutional claims for equitable relief. Dotson, 398 F.3d at 159-61, 179-83. In reaching this determination, the circuit court emphasized the existence of the federal judiciary's extensive equal opportunity and employment dispute system. Id. at 159-83. According to the Dotson court, the Judicial Branch has long provided its personnel with the opportunity to challenge adverse employment decisions and obtain various forms of relief, including reinstatement. See, e.g., id. at 181. In fact, "the judiciary has itself provided for its employees what can only be afforded private employees or employees of other branches of

29

government through legislation:  a measure of judicial review for claims of employment discrimination."  Id. at 161; see also id. at 176 n.14 ("Indeed the judiciary is unique among the branches of government in being able to provide for itself some review of its administrative employment decisions by a judicial officer.  For other branches of government, judicial review of administrative employment decisions requires legislation.").  Congress, especially in conjunction with the 1995 enactment of the CAA extending labor protections to Legislative Branch employees, has monitored and engaged in a dialogue with the judiciary to assess whether legislation was necessary to protect the rights of Judicial Branch employees.  Id. at 173-76, 181-82.  "In this context, Congress's decision not to act endorses the conclusion that it considered the judicial review available to judicial branch employees through the judiciary's own review plans adequate and intended no supplemental judicial review either at law or in equity."  Id. at 181.  Given such circumstances, we agree with the Second Circuit that it would be unnecessary and even inappropriate to allow a judicial employee to file a lawsuit against a judicial officer where the judiciary has already provided a means for this person to obtain meaningful relief together with a measure of judicial review.[4]  See, e.g., id. at 181.

---

[4] We note that the Ninth Circuit followed our example in Mitchum to conclude that the statutory scheme governing TSA security screeners did not preclude a district court action for equitable relief filed by a union and a former screener who alleged that the TSA violated the First Amendment by disciplining and discharging the screener for

30

### 3. The District Court's Consolidated Model Plan

Accordingly, we now must decide whether Semper himself could pursue meaningful relief under a remedial plan that provides for meaningful review by judicial officers. We ultimately determine that he could do so pursuant to the District Court's "Equal Employment Opportunity and Employment Dispute Resolution Plan."

As Appellees (and the District Court) note, the Consolidated Model Plan[5]—which was drafted by the Third Circuit Judicial Council and adopted by the District Court of the Virgin Islands—provides for a review process consisting of the following stages: counseling, mediation, a "hearing before the chief judge (or his or her designee) of the court in which the alleged violation arises," and, finally, "review of

_____

taking part in union activities. Am. Fed. Of Gov't Employees Local 1 v. Stone, 502 F.3d 1027, 1029-32, 1034-39 (9th Cir. 2007). In the process, the Ninth Circuit expressly distinguished Dotson on the grounds that the former judicial employee "had other remedial mechanisms available." Id. at 1038 (citing, inter alia, Dotson, 398 F.3d at 181).

[5] Although the Consolidated Model Plan was not included in the record on appeal, we note that it was discussed by both the Court of Federal Claims and the District Court and that Semper himself submitted a copy of the document to the Court of Federal Claims. See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 n.3 (3d Cir. 1988).

31

the hearing decision under procedures established by the judicial council of the circuit." (Appellees' Addendum at 20.) The remedial plan expressly covers probation officers. An employee may ask for the disqualification of a judicial officer with prior involvement in the dispute by filing a written request with the Chief Judge (which will be decided by the next otherwise available active judge if the Chief Judge is named as involved in the dispute). If the Chief Judge is disqualified or unavailable, this next available active judge will then serve as the reviewing officer. In turn, where the employee alleges that an Article III judge has violated rights protected by the Consolidated Model Plan, this judge may elect to have a hearing conducted by a judicial officer from another court. The employee (as well as the individuals alleged to have violated his or her rights and the unit executive in charge of the employing office) has the right to be represented by a person of his or her choice.

After providing notice and an opportunity to respond, the respective judicial officer may dismiss in writing any complaint that the judge finds to be frivolous, unduly repetitive, fails to state a claim upon which relief may be granted, or makes a claim that was not advanced in mediation. If not, the judge "shall hold a hearing on merits of the complaint unless he or she determines that no material factual dispute exists." (Id. at 28.) The presiding judicial officer may provide for discovery and investigation before any such hearing takes place. "At the hearing, the complainant, the unit executive of the office against which the complaint has been filed and the individual alleged to have violated rights protected by this Consolidated Model

32

Plan will have the rights to representation, to present evidence on his or her behalf, and to cross-examine adverse witnesses." (Id. at 29.) A verbatim record of the hearing must be prepared, and the judicial officer must issue a final decision in writing. "The EDR/EEO Decisions Review Committee of the Third Circuit Judicial Council, on behalf of the Third Circuit Judicial Council, will review decisions of the hearing officer, when properly petitioned, . . . by a party or individual aggrieved by a final decision of the hearing officer or by a summary dismissal of the complaint." (Id. at 31.) "Any review will be conducted by a judicial officer, based on the record created by the hearing officer, and shall be affirmed if supported by substantial evidence." (Id. at 30.) The review committee's decision must be in writing.

The Consolidated Model Plan expressly provides for a number of different remedies, such as "reinstatement to a position from which previously removed," "back pay and associated benefits, including attorneys' fees, where the statutory criteria of the Back Pay Act" are satisfied, "records modification and/or expungement," "'equitable' relief, such as temporary stays of adverse actions," and "appropriate action against a judicial officer or other individual found to have violated rights protected under this Consolidated Model Plan." (Id. at 32.) Retaliation against complainants and participants in the filing or processing of a complaint is expressly prohibited.

The detailed remedial scheme adopted by the District Court clearly provides for both a measure of judicial review and the means to obtain meaningful relief to "[a]n employee

33

covered under this Consolidated Model Plan who claims a denial of the rights granted hereunder." (Id. at 20.) Unlike their competitive service counterparts in Elgin (who only have a right to seek judicial review by the Federal Circuit of decisions rendered by the MSPB, see, e.g., Elgin, 132 S. Ct. at 2130-31), a District Court employee may obtain a hearing on the merits of his or her complaint before an actual judicial officer. If this judicial officer rules against the employee, he or she then may seek review by a panel of other judicial officers, subject to the same substantial evidence standard applicable to the Federal Circuit's review of MSPB decisions. See, e.g., id. Admittedly, the Consolidated Model Plan does expressly prohibit "payment of attorneys' fees (except as authorized under the Back Pay Act)." (Id. at 33). But it still authorizes the judicial officer to provide a wide range of other remedies to a successful complainant, such as back pay and associated benefits (including attorney's fees if authorized under the Back Pay Act), expungement of the record, and other forms of equitable relief. Most importantly, the District Court's plan expressly provides for the remedy of reinstatement. Cf., e.g., Bush, 462 U.S. at 372 & n.9 (assuming that Bush's civil service remedies were not as effective as individual damages remedy and did not fully compensate him for harm suffered and observing that his attorney's fees were not paid).

The parties as well as the Court of Federal Claims and the District Court itself vigorously contest the applicability of the Consolidated Model Plan. Semper also contends that the doctrine of judicial estoppel bars Appellees from now taking the position that the District Court's remedial plan applies to

34

his claims. In the end, we agree with the Appellees' own reading of the District Court's remedial plan—specifically that it "covers plaintiff's claim that he was terminated without cause and in violation of his due process rights." (Appellees' Brief at 36 (citation omitted).)

The Consolidated Model Plan includes the following "Coverage" language:

> This Consolidated Model Plan addresses the following workplace and employment issues:
>
> (1) equal employment opportunity and anti-discrimination rights;
> (2) sexual harassment;
> (3) personnel practices, including recruitment, hiring, promotion and advancement;
> (4) family and medical leave rights;
> (5) worker adjustment and retraining notification rights;
> (6) employment and re-employment rights of members of the uniformed services;
> (7) occupational safety and health protections;
> (8) polygraph tests; and
> (9) employee dispute resolution procedures for claims of the

35

denial of the rights afforded under
this Consolidated Model Plan.

(Appellees' Addendum at 8-9.)  The document then contains separate chapters addressing the various workplace and employment rights that it protects, i.e., "Equal Employment Opportunity and Anti-Discrimination Rights" (Chapter 2), "Personnel Practices" (Chapter 3), "Family and Medical Leave Rights" (Chapter 4), "Worker Adjustment and Retraining Notification Rights" (Chapter 5), "Employment and Reemployment Rights of Members of the Uniformed Services" (Chapter 6), "Occupational Safety and Health Protections (Chapter 7), and "Polygraph Tests" (Chapter 8). (Id. at 14-19 (emphasis omitted).)  Furthermore, "[i]t is intended to be the exclusive remedy of the employee relating to rights enumerated under this Consolidated Model Plan." (Id. at 9.)  Therefore, "[a]n employee covered under this Consolidated Model Plan who claims a denial of the rights granted hereunder shall seek resolution of such claims through the procedures" established by the Consolidated Model Plan itself. (Id. at 20.)  However, general employment dispute and personnel grievance procedures that do not "invoke the protections of this Consolidated Model Plan" also remain in effect. (Id. at 9.)  In seeking relief, the employee is required to select either the Consolidated Model Plan or (if available) the general grievance and adverse action appeal procedures.

According to Semper, the remedial plan does not protect or enumerate any employee rights with respect to termination unless the employee was terminated for

36

discriminatory reasons or some other ground otherwise covered by the plan document itself (e.g., in retaliation for filing a complaint). We acknowledge that Chapter 3, which governs "Personnel Practices," does not expressly refer to discharge or termination. (Id. at 15 (emphasis omitted).) Likewise, the "Coverage" section itself does not include termination in its enumeration of covered "personnel practices." (Id. at 8.) Semper claims that the absence of any reference to termination is not surprising because most judicial employees are terminable at will. Probation officers, however, have a statutory right to for-cause termination. Accordingly, the Judicial Conference has developed a "Model Adverse Action Procedure for Removal of a Probation Officer." Unlike the United States District Court for the Southern District of New York, Dotson, 398 F.3d at 161, the District Court of the Virgin Islands has not adopted this specific plan.

Although Semper does present a somewhat plausible reading of the Consolidated Model Plan, we nevertheless determine that the remedial plan adopted by the District Court "covers plaintiff's claim that he was terminated without cause and in violation of his due process rights." (Appellees Brief at 36 (citation omitted).) In other words, we believe that Semper, in essence, "claims a denial of the rights granted [under the Consolidated Model Plan]." (Appellees' Addendum at 20.) Intended to provide District Court employees with their exclusive remedy, the 29-page Consolidated Model Plan addresses at some length its purpose and scope, the various rights protected, the procedures to be followed by an employee who complains

37

that his or her rights have been violated, and the remedies available if judicial officers find that such rights have actually been infringed. In turn, the remedial plan expansively "addresses" a number of "workplace and employment issues," specifically enumerated in nine distinct categories ranging from "equal employment opportunity and anti-discrimination rights" to "employment dispute resolution procedures for claims of the denial of the rights afforded under this Consolidated Model Plan." (Id. at 8-9.) Accordingly, the Court of Federal Claims was incorrect when it stated that the District Court's remedial plan "covers only equal employment opportunity and anti-discrimination rights." Semper, 100 Fed. Cl. at 637 (citing Consolidated Model Plan). In fact, the document actually lists "personnel practices" as one of the "workplace and employment issues" it is meant to address. (Id. at 8.) It then states that such practices "include" recruitment, hiring, promotion, and advancement, indicating that additional "personnel practices"—like termination of employment—are encompassed under this rubric. See, e.g., In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 241 (3d Cir. 2008) ("It is a well-established canon of statutory construction that when the word 'including is followed by a list of examples, those examples are generally considered illustrative rather than exhaustive.'" (citations omitted)). The Consolidated Model Plan also authorizes the judicial officer to order "reinstatement to a position from which [the complainant was] previously removed." (Id. at 32.) Obviously, an individual cannot be reinstated unless the employment relationship was terminated in some fashion. Although (as Semper indicates) the reinstatement remedy may be available

where, for instance, an otherwise at-will employee was terminated for discriminatory reasons, we believe that the existence of this remedy—considered together with the other aspects of the expansive remedial plan adopted by the District Court for its own employees—weighs in favor of Appellees' reading. We find it unlikely that such a comprehensive plan designed to protect the rights of employees would not cover probation officers who (unlike their co-workers) are protected from termination by a specific statutory provision.

It is undisputed that Appellees did not specifically assert that the Consolidated Model Plan applies to Semper and his claims for relief before they filed their appellate brief with this Court. In addition to claiming that Appellees thereby waived any argument that the District Court's remedial plan provides a remedy, Semper vigorously contends that the doctrine of judicial estoppel should be applied to bar Appellees' "gamesmanship" in opportunistically seizing on the District Court's incorrect characterization of the Consolidated Model Plan "to now claim that [it] gave Officer Semper a remedy." (Appellant's Reply Brief at 7 (emphasis omitted).) In particular, he points to the following exchange that occurred at oral argument before the Federal Circuit between the Justice Department attorney and Judge O'Malley:

> Q. "Was there a mechanism for [Officer Semper] to challenge [his termination] within the Circuit?"

A.     "As far as I know, Mr. Semper is right, is that, the district court in the Virgin Islands has not adopted the specific adverse procedures with respect to pers__, um probation officers and I believe the regular employment dispute resolution procedures do not cover this situation so I, I I, don't believe there was an administrative remedy within this particular court."

(Id. at 2 (quoting Recording at 18:35-19:05).)  The Justice Department attorney made a similar statement in response to a question by Judge Bryson asking "'[h]ow does that person enforce the 'for cause' entitlement, other than by moral suasion'": "'I'm not sure that he can.  I'm not sure that there is a judicial remedy.'"  (Id. at 16 (quoting Recording at 16:55-17:22).)

"Judicial estoppel is a fact-specific, equitable doctrine, applied at courts' discretion."  In re Kane, 628 F.3d 631, 638 (3d Cir. 2010).  It rests on the basic notion that, "'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'"  Id. (quoting Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 214, 319-20 (3d Cir. 2003)); see also, e.g., id. (noting that several criteria guide application of judicial estoppel doctrine, i.e., whether two positions are irreconcilably inconsistent, whether the party changed position in bad faith, whether relief is tailored to address harm

40

and no lesser sanction would suffice as remedy, and whether party is provided with opportunity to offer explanation).

We are troubled by the manner in which the Justice Department has addressed the applicability of the District Court's remedial plan, and we are especially concerned about the statements made at oral argument before the Federal Circuit. Under the circumstances, one could reasonably conclude that Semper is the victim of the proverbial "run around" in his ongoing attempt to have his constitutional claims heard on their merits and obtain some sort of relief— from the Court of Federal Claims and the Federal Circuit to the District Court and this Court and, finally, to the remedial process adopted by the District Court.

Nevertheless, we do not believe that it is appropriate to apply this fact-specific and equitable doctrine in the present circumstances.

Initially, Appellees appropriately note that judicial estoppel cannot be used to create subject matter jurisdiction. See, e.g., Erie Ins. Exch. v. Erie Indemn. Co., 722 F.3d 154, 162-63 (3d Cir. 2013). Likewise, such jurisdictional defects may be raised at any time (and, in fact, must be raised sua sponte). See, e.g., Frett-Smith v. Vanterpool, 511 F.3d 396, 399 n.3 (3d Cir. 2008). The question of whether or not the CSRA bars a federal employee from challenging an adverse employment action in an action filed pursuant to § 1331 represents a threshold jurisdictional determination. See, e.g., Elgin, 132 S. Ct. at 2132 ("We granted certiorari to decide whether the CSRA precludes district court jurisdiction over

41

petitioners' claims even though they are constitutional claims for equitable relief. We conclude that it does, and we therefore affirm." (citations omitted)); Sarullo, 352 F.3d at 797 ("For these reasons, we hold that the District Court lacked subject matter jurisdiction to hear Sarullo's Bivens claim as such a claim was barred by the comprehensive statutory scheme provided in the CSRA, and should have dismissed the Bivens claim for lack of subject matter jurisdiction."). In this appeal, we must determine whether the CSRA precludes Semper's constitutional claims for equitable and injunctive relief, and our determination rests on whether he could pursue meaningful relief under a remedial plan that provides for meaningful review of his claims by judicial officers. Accordingly, this jurisdictional inquiry implicates more than (in Semper's terms) "'prudential exhaustion.'" (Appellant's Reply Brief at 10 n.8 (citation omitted).)

We further note that it was Semper himself who insisted (and continues to insist) that the Consolidated Model Plan does not apply in the present circumstances. According to Semper, the government successfully argued before the Federal Circuit that the CSRA provides the exclusive remedy and thereby necessarily conceded that the Consolidated Model Plan does not apply in the current circumstances. In short, "[i]f the [Consolidated Model Plan] had provided Officer Semper with a remedy, the task of dismissing Officer Semper's complaint in the Court of Federal Claims would have been easy – simply move to dismiss based upon the exclusive remedy provided by the [Consolidated Model Plan]." (Appellant's Reply Brief at 40.) He nevertheless fails to cite to any case in which a § 1331 action was dismissed

42

simply because a court (or a federal agency) had established its own administrative remedies for employment disputes. In Duffy v. Wolle, 123 F.3d 1026 (8th Cir. 1997), abrogated on other grounds, Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011) (en banc), the Eighth Circuit specifically determined that a district court's adoption of an equal employment opportunity plan did not prevent an unsuccessful applicant from bringing a Bivens damages claim for reverse discrimination in the selection of a new chief probation officer, id. at 1034-35. Significantly, "[i]t appears that the defendants in Duffy never suggested that the CSRA preempted plaintiff's claim." Lee, 145 F.3d at 1276 n.4. The Second Circuit in Dotson more recently concluded that the CSRA barred the former probation officer's discrimination and due process claims because of, among other things, "the existence of the judiciary's own administrative review procedures for employment disputes." Dotson, 398 F.3d at 160. In addition, the Federal Circuit considered Semper's argument that "the government's contention that the CSRA forecloses actions by Judicial Branch employees in the Court of Federal Claims challenging adverse agency actions of the type covered by the CSRA would invalidate internal administrative remedies devised by Judicial Branch agencies to deal with their employees' employment-related complaints." Semper, 694 F.3d at 94 n.2. The Federal Circuit expressly rejected this argument, observing that Congress's decision to foreclose excepted service employees from challenging adverse employment actions in actions filed with the Court of Federal Claims does not in any way suggest that Congress intended to bar either the Judicial or the

43

Executive Branch from devising their own administrative remedies. Id.

Furthermore, we believe that Semper asks us to accord too much weight to the Court of Federal Claims's characterization of the Consolidated Model Plan. "[J]udicial estoppel is generally not appropriate where the defending party did not convince the [court] to accept its earlier position." G-Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009) (citing United States v. Pelullo, 399 F.3d 197, 222-23 (3d Cir. 2005); Dam Things from Denmark v. Russ Berrie & Co., 290 F.3d 548, 599 n.16 (3d Cir. 2002); Montrose Med. Group v. Bulger, 243 F.3d 772, 778 (3d Cir. 2001)). The Court of Federal Claims rejected the government's theory that CSRA foreclosed Semper from seeking relief in the Court of Federal Claims. Semper, 100 Fed. Cl. at 626-33. "[T]he court concluded that it lacked jurisdiction over his claim because he failed to point to any money-mandating statute or regulation that would give him a right to contest his termination before that court." Semper, 694 F.3d at 92. It accordingly considered the Consolidated Model Plan (and other remedial schemes that have not been adopted by the District Court) as part of this money-mandating statute inquiry, and it concluded that "[s]imply because the District Court of the Virgin Islands has not adopted the model procedures does not give plaintiff a cause of action in this court or in any other federal court." Semper, 100 Fed. Cl. at 638. While the Federal Circuit affirmed the dismissal of Semper's complaint based on the CSRA theory originally advanced by the government, it did not specifically discuss the applicability of the Consolidated Model Plan. In

44

fact, the only time it really addressed the judiciary's remedial plans was in the context of rejecting Semper's own theory that the government's approach would invalidate any administrative remedies devised by the judiciary. Semper, 694 F.3d at 94 n.2.

In conclusion, we determine that the District Court of the Virgin Islands lacks subject matter jurisdiction over Semper's constitutional claims for equitable and declaratory relief. We accordingly will affirm the District Court's dismissal of Count Two (Semper's official capacity claim against then-Chief Judge Gomez) and Count Three (his claim against the United States) for lack of subject matter jurisdiction. We likewise conclude that Count One (Semper's claim against then-Chief Judge Gomez named in his individual capacity) must be dismissed on the same grounds.[6] See, e.g., Sarullo, 352 F.3d at 797 (concluding that district court should have dismissed Bivens claim for lack of subject matter jurisdiction). Semper asks us to refer this matter to the Third Circuit Judicial Council to fashion a remedy for him if we ultimately affirm the decision of the District Court. Such a step appears unnecessary at this time given our conclusion

---

[6] Because of our jurisdictional ruling, we need not—and do not—determine whether the District Court properly concluded that Count One failed to state a claim under Rule 12(b)(6). We likewise need not—and do—not reach the question of whether the District Court of the Virgin Islands constitutes an "agency" for purposes of the APA (in other words, whether it should be considered as either a court of the United States or as part of a territorial government).

45

that, in the Appellees' own words, the Consolidated Model Plan does "cover plaintiff's claim that he was terminated without cause and in violation of his due process rights." (Appellees' Brief at 36 (citations omitted).) In turn, our disposition of this appeal is premised on the expectation that Appellees will continue to abide by—and defend—their current reading of the Consolidated Model Plan (a reading that they once again reiterate in a letter submitted following oral argument) if Semper decides to pursue relief under the Consolidated Model Plan itself. We also note that the Consolidated Model Plan expressly authorizes the judicial officer to grant extensions of time, i.e., "[t]he chief judge of the court, or other presiding judicial officer, may extend any of the deadlines set forth in this Consolidated Model Plan for good cause." (Appellees' Addendum at 21.)

## B.    Semper's Mandamus Claim

In Count Four, Semper sought mandamus relief against then-Chief Judge Gomez on the grounds that he "has a clear right to be employed as a probation officer until such time as he is found, after notice and an opportunity to [be] heard, that there is cause to terminate him" and that Chief Judge Gomez "has a clear legal duty to continue to employ Officer Semper until such time as Officer Semper is given notice and a pre-termination hearing as to the basis for the claim that there is a cause to dismiss him." (A32.) The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any

46

agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

Semper recognizes that the District Court of the Virgin Islands does not constitute an "agency" for purposes of this statutory provision. Relying on the doctrine of judicial immunity as well as the Tenth Circuit's ruling in Trackwell v. United States Government, 472 F.3d 1242 (10th Cir. 2007), he goes on to claim that a judge or judicial employee constitutes "an officer or employee of the United States," at least with respect to non-judicial administrative duties. However, as the Second Circuit explained in Liberation News Service v. Eastland, 426 F.2d 1379 (2d Cir. 1970), it appears that Congress, in enacting § 1361 (and 28 U.S.C. § 1391(e), a related venue provision), "was thinking solely in terms of the executive branch,'" Eastland, 426 F.2d at 1384. "Relying on Eastland, two other circuit courts have held that § 1391(e) does not apply to defendants affiliated with the judicial branch." Trackwell, 472 F.3d at 1246 (citing King v. Russell, 963 F.2d 1301, 1303-04 (9th Cir. 1992); Duplantier v. United States, 606 F.2d 654, 663-64 (5th Cir. 1979)). The Trackwell court concluded that a district court lacked jurisdiction over a mandamus claim against the Clerk of the United States Supreme Court because, while the office of the Clerk is not the Supreme Court itself, the plaintiff was asking him to perform a judicial function delegated by the Supreme Court itself, i.e., the filing of an application (and, in the judicial immunity context, a court clerk who assists a court or a judge in the discharge of judicial functions is considered to be the functional equivalent of the judge). Id. at 1247. Likewise, we do not believe that it would be appropriate for the District

47

Court of the Virgin Islands to issue a writ of mandamus against its own Chief Judge, "ordering him to reinstate Mr. Semper to his position as probation officer, retroactive to August 6, 2010, until ordering that he may not terminate Officer Semper without first providing him with notice and an opportunity to be heard as to the basis for any such termination" (A32).  See, e.g., id. at 1246 ("For a district court to issue a writ of mandamus against an equal or higher court would be remarkable."); Semper, 2013 WL 2451711, at *6 ("Although a higher court has power to grant a writ of mandamus against a lower court, the district court has no power to issue the writ against its judicial officers or the federal courts." (citing Smith v. Kriegh, 643 F. Supp. 2d 1274 (D. Colo. 2009); 28 U.S.C. § 1651).  It is not surprising that Semper himself has failed to cite to any decision allowing such an unusual claim to go forward.

We therefore conclude that the District Court properly dismissed Count Four on jurisdictional grounds.  In any event, a writ of mandamus also represents an extraordinary remedy.  See, e.g., Stehney v. Perry, 101 F.3d 925, 934 (3d Cir. 1996) ("'It is not disputed that the remedy of mandamus is a drastic one, to be invoked only in extraordinary situations.'" (quoting Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980) (footnote omitted)).  Specifically, "[t]he common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief."  Heckler v. Ringer, 466 U.S. 602, 616 (1984) (citing Kerr v. U.S. Dist. Ct., 426 U.S. 394, 402-03 (1976); United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543-44 (1937)); see

48

also, e.g., <u>Stehney</u>, 101 F.3d at 934 n.6. As we have explained in some detail, Semper could pursue meaningful relief under the Consolidated Model Plan adopted by the District Court of the Virgin Islands. Accordingly, we do not believe that the extraordinary remedy of a writ of mandamus would be appropriate in the present circumstances.

### III.

For the foregoing reasons, we will affirm the order of the District Court insofar as it dismissed Counts Two, Three, and Four of Semper's amended complaint for lack of subject matter jurisdiction. In addition, we will remand this matter to the District Court with instructions to dismiss Count One of the amended complaint for lack of subject matter jurisdiction.

49